Harry R. RUPRECHT and Barbara
D. Ruprecht, Appellants,

v.

ZONING HEARING BOARD OF HAMP-
TON TOWNSHIP and Madia Homes,
Inc. and Township of Hampton.

Commonwealth Court of Pennsylvania.

Argued May 14, 1996.
Decided July 24, 1996.

John Linkosky, for Appellants.

Scott D. Cessar, for Appellee, Madia Homes, Inc.

Before COLINS, President Judge, FRIEDMAN, J., and SILVESTRI, Senior Judge.

FRIEDMAN, Judge.

Harry R. Ruprecht and Barbara D. Ruprecht (the Ruprechts) appeal from an order of the Court of Common Pleas of Allegheny County (trial court) affirming, without opinion, the decision of the Zoning Hearing Board (ZHB) of Hampton Township (Township) to grant variances to Madia Homes, Inc. (Madia) for the construction of a townhouse development.[1] We affirm.

On March 24, 1994, the Township's zoning officer issued building permits to Madia for a townhouse complex consisting of nine lots on Parcel O of the Hemlocks II Planned Residential Development (PRD), located at 2320–2336 Big Rock Road.[2] The Ruprechts appealed the issuance of the permits to the ZHB, contending that Madia's proposed development violates the Township's Zoning Ordinance (Ordinance 398) as follows: (1) it does not comply with the bulk and area requirements for property located in a Residential C District, as set forth in Table A of Ordinance 398;[3] (2) it exceeds the permissible maximum lot coverage; and (3) it violates the minimum parking requirements.

Madia filed a petition with the ZHB seeking variances from the front, rear and side yard setbacks for eight of the nine lots in Parcel O of the Hemlocks II Plan. Madia did not believe a variance was necessary with respect to maximum lot coverage or minimum parking. The ZHB consolidated the Ruprechts' appeal and Madia's petition and held hearings on the matters.

At the hearings, the Ruprechts contended that Madia's property was subject to Table A bulk and area requirements for Residential C property. (R.R. at 49a.) Madia, however,

---

1. In issuing its October 26, 1995 order without opinion, the trial court adopted the reasoning of the ZHB's October 31, 1994 decision.

2. The Township's zoning officer later revoked the permits for lots seven, eight and nine. (ZHB's op. at 2, n. 1.)

3. Table A of Ordinance 398 requires a minimum front and rear yard setback of 30 feet and a minimum side yard setback of 25 feet. (R.R. at 40a, 49a.)

argued that its property, as part of the Hemlocks II Plan, constituted a Planned Residential Development (PRD) and, therefore, was governed by the Density, Area and Setback Standards of Table C of Ordinance 398.[4] (R.R. at 53a.)

Upon consideration of the positions of the parties, a majority of the ZHB found that: (1) the Hemlocks II Plan had received final approval as a Planned Unit Development (PUD) in 1972;[5] (2) the PUD approval was not revoked by operation of section 3(D) of the Township's old zoning ordinance, Ordinance 145;[6] (3) the PUD approval was not revoked by Ordinance 398's reclassification of the Hemlocks II area as a Residential C District in 1989;[7] and (4) the PUD approval was not revoked by section 9.440 of Ordinance 398.[8] Thus, the ZHB concluded that the standards set forth in Table C of Ordinance 398 would govern Madia's application for variances.[9]

Having made this determination, the ZHB then addressed Madia's specific requests for variances, in each instance considering the relevant factors identified in sections 15.512(a)–(e) of Ordinance 398.[10] The ZHB

---

4. Section 9.211 of Ordinance 398 classifies a PRD in a Residential C zoning district as a PRD–M. According to Table C, a PRD–M must have a 25-foot street right-of-way (front yard) setback and a 30-foot rear yard setback. There is no requirement for a side yard setback. (R.R. at 53a.)

5. A PUD is the 1972 equivalent of a PRD. (R.R. at 542a–56a.)

6. Ordinance 145 was enacted on April 29, 1971 and was in effect when Madia sought approval for the Hemlocks II Plan as a PUD. (R.R. at 537a–56a.) Section 3(D) of Ordinance 145 provides that a landowner can abandon a PUD plan (1) by notifying the governing body in writing or (2) by failing to commence and carry out the PUD within such reasonable time as may be fixed by ordinance after final approval has been granted. (R.R. at 555a.)

 The ZHB noted that the PUD was never abandoned by notice to the governing body in writing. The ZHB also noted that the Township never established by ordinance a "reasonable time" to commence and carry out the PUD. (ZHB's op. at 8–9.)

7. The Ruprechts argued that the Township reclassified the Hemlocks II area as Residential C with the passage of Ordinance 398 in 1989. They pointed out that the new zoning map did not disclose the existence of a PRD in the Residential C area encompassing Hemlocks II. (ZHB's op. at 9.)

 The ZHB rejected this argument because it believed that the Township did not intend to revoke previously approved PRD's and because the zoning map contained other obvious errors. (ZHB's op. at 10.)

8. Section 9.440 of Ordinance 398 provides that approval of a PRD shall be revoked (1) if the developer gives notice of an intention to abandon the plan, or (2) if the developer fails to commence within six months and complete within two years of the date of final approval. (R.R. at 61a–62a.)

 The ZHB concluded that section 9.440 did not revoke the PRD because that section did not state what the developer had to complete within two years. The ZHB assumed that the developer had to complete sewers and streets indicated on the plat plan within the two year period, which was done here. (ZHB's op. at 11.) In fact, the recorded plat plan in this case only depicts the layout of the lots, the streets and the sanitary and utility easements. Unlike the development plan presented by Madia for Parcel O, the recorded plat plan does *not* show the location and size of buildings, the walkways, the curbs, the driveways, the front, side and rear yard setbacks or the parking areas.

9. The ZHB also determined that, because the original PUD plan had been approved under Ordinance 145, Madia did not have to comply with the density and open space requirements of Ordinance 398. (ZHB's op. at 12.)

10. Sections 15.512(a)–(e) provide in pertinent part as follows:

 [The ZHB] may grant a variance, provided that all of the following findings are made where relevant in a given case:
 a. that there are unique physical circumstances or conditions ... peculiar to the particular property, and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of this Ordinance in the neighborhood or district in which the property is located;
 b. that, because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of this Ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property;
 c. that, such unnecessary hardship has not been created by the appellant;
 d. that, the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located nor substantially or permanently impair the appropriate use or development of adjacent

first granted a variance from the minimum parking requirements set forth in Article 13 of Ordinance 398;[11] this variance applied to all eight lots. The ZHB then determined that no other variances were required for Lots 2, 3, 4 and 5. With respect to Lot 1, the ZHB granted an additional variance from the minimum building separation requirement of Table C. With respect to Lots 6, 7 and 8, the ZHB granted variances from the front and rear yard setback requirements of Table C.

The Ruprechts appealed the ZHB's decision to the trial court, which affirmed the decision of the ZHB.

## I.

■ On appeal to this court,[12] the Ruprechts first argue that the ZHB erred in finding that the Township had given final approval of the Hemlocks II Plan as a PUD in 1972. We disagree.

Section B(7)(b) of Ordinance 145, which governed the 1972 PUD approval process, states: *"Tentative approval* of a development plan shall *not* qualify a plat of ... [a PUD] for recording...."* (R.R. at 552a.) (Emphasis added.) Section C(5) of Ordinance 145 states that a plan which has been given *final approval* "shall be so certified without delay by the Board and shall be filed of record

> property or be detrimental to the public welfare; and
> e. that the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.
> (R.R. at 152a–53a.)

11. Although Madia did not believe that a minimum parking variance was necessary, the ZHB recognized that the language of Article 13 of Ordinance 398 was difficult to interpret. Thus, to the extent that Article 13 *might* prohibit a front yard garage and driveway, the ZHB granted a variance. (ZHB's op. at 15–16.)

12. Where the trial court takes no additional evidence in a zoning case, our scope of review is limited to determining whether the ZHB committed an abuse of discretion or an error of law. *Isaacs v. Wilkes Barre City Zoning Hearing Board,* 148 Pa.Cmwlth. 578, 612 A.2d 559 (1992).

13. Section C(1) of Ordinance 145 states that an application for *final approval* shall be accompanied by:

forthwith in the office of the Recorder of Deeds of Allegheny County, together with any restrictive covenants ... which govern the ... [PUD]."[13] (R.R. at 555a.)

■ Here, the record shows that the plats for the Hemlocks II Plan, together with restrictive covenants, were recorded in the office of the Recorder of Deeds of Allegheny County on May 25, 1972. (R.R. at 512a–28a.) The plats indicate approval by the Board of Commissioners on May 3, 1972 and approval by the Planning Commission on April 24, 1972. (R.R. at 512a.) We believe that such constitutes substantial evidence to support the ZHB's finding.[14]

## II.

The Ruprechts next argue that, even if the Township gave final approval to the Hemlocks II Plan in 1972, the ZHB erred in applying the bulk and area requirements for a PRD in Table C of Ordinance 398 because, under section 711(d) of the Pennsylvania Municipalities Planning Code (MPC),[15] once a PRD has received final approval, subsequent zoning ordinance regulations do not apply. We believe that the Ruprechts have misconstrued section 711(d) of the MPC.

■ Section 711(d) of the MPC, 53 P.S. § 10711(d) (emphasis added), provides in pertinent part as follows:

> b. Restrictive covenants executed by all owners of the premises within the section covered by the final plan which, *if approved,* shall be recorded in the Recorder's Office of Allegheny County.
> (R.R. at 553a.) (Emphasis added.)

14. The Ruprechts argue that, because there are no minutes of a public hearing which granted final approval for the Hemlocks II Plan PUD, the Township never gave its final approval. However, section C(2) of Ordinance 145 states that a public hearing on an application for final approval is not required.

Moreover, sections C(3) and C(4) of Ordinance 145 require that the ZHB grant final approval within thirty days of filing unless the submitted plan contains variations from the plan given tentative approval. (R.R. at 553a–54a.) There is no evidence here that the Hemlock's II final plan contained any variation from the tentative plan.

15. Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10711(d).

Upon the filing of record of the development plan the *zoning and subdivision regulations* otherwise applicable to the land included in such plan shall cease to apply thereto.

Under Pennsylvania law, zoning and subdivision regulations are distinct types of land development controls; Article V of the MPC treats subdivision regulations while Article VI of the MPC governs zoning. Robert S. Ryan, *Pennsylvania Zoning Law and Practice* § 12.1.4 (1981). Thus, section 711(d) of the MPC means only that Articles V and VI of the MPC, which *would* apply to the land if the property was not a PRD, do not apply once the land has received final PRD approval under Article VII of the MPC. *See* Section 707(6) of the MPC, 53 P.S. § 10707(6) (PRD approval process in Article VII shall be in lieu of all other approvals otherwise required under Articles V and VI.) Contrary to the contention of the Ruprechts, section 711(d) has nothing to do with the applicability of subsequent local ordinances.

### III.

■ The Ruprechts also maintain that, because the Township's official zoning map places the Hemlocks II property in a Residential C zoning district,[16] (R.R. at 211a), the ZHB erred in treating the property as a PRD. We disagree.

Article 7 of Ordinance 398 establishes the ten classes of zoning districts which appear on the Township's official zoning map.[17] (R.R. at 37a–39a.) One of these districts is a Residential C District; however, PRD is *not* one of the ten classes of zoning districts which appear on the Township's official zoning map. In other words, the Township's official zoning map will *never* designate an area of the Township as a PRD. (*See* Township's Zoning Map, R.R. at 195a.) Indeed, rather than being a separate zoning district, a PRD may be constructed *within* a Residential A, B, C or D zoning district. (R.R. at

51a, 54a.) Thus, the Ruprecht's third argument must also fail.

### IV.

■ The Ruprechts next contend that, because constructing "groups of [townhouse] buildings ... on the same property" is a conditional use in a Residential C District under section 8.533 of Ordinance 398, (R.R. at 43a), the ZHB erred in determining that Madia did not require conditional use approval prior to the issuance of the building permits. We disagree.

The Ruprecht's argument is based on equating a PRD with "groups of [townhouse] buildings ... on the same property." However, a careful reading of Ordinance 398 shows that the Township does not consider a PRD to be the same as a group of townhouses built on the same property. It is clear that, pursuant to sections 9.210 and 9.311 of Ordinance 398, a landowner may develop a PRD in Residential A, B, C or D zoning districts. It is equally clear that, pursuant to sections 8.300 and 8.400 of Ordinance 398, a landowner who has not received approval for a PRD may not otherwise construct a group of townhouses in Residential A or B zoning districts. Thus, Ordinance 398 obviously draws a distinction between townhouses constructed as part of a PRD and townhouses constructed otherwise. Again, the Ruprecht's argument must fail.

### V.

■ The Ruprechts next argue that the ZHB erred in granting Madia a building separation variance for Lot 1 and dimensional variances for Lots 6, 7 and 8 based solely on the factors described in sections 15.512(d) and (e) of Ordinance 398. The Ruprechts maintain that the ZHB should have considered every factor in that section. Madia counters that, even if the ZHB had considered every factor, the ZHB would have

---

16. Section 4.400 of Ordinance 398 states: "The Official Zoning Map ... shall be the final authority as to the current zoning status of land...." (R.R. at 20a.)

17. Article 7 of Ordinance 398 states in pertinent part: "The Township ... is hereby divided into ten (10) classes of zoning districts as shown graphically on the Official Zoning Map." (R.R. at 37a.)

granted the variances. We agree with Madia.

Indeed, Lot 1 is 32.46 feet wide and is situated 22 feet from the edge of an existing townhouse on Lot 8 of Parcel N. The building separation requirement for a PRD in a Residential C district is 40 feet. Without a variance, Madia would have to build a 14.46–foot wide townhouse on Lot 1. Mr. Ruprecht conceded in his testimony that a 14–foot townhouse would not be livable. (R.R. at 450a.) Mr. Madia testified that a 14.46–foot wide townhouse would not be livable or buildable. (R.R. at 473a–74a.) We believe that such testimony establishes that the width of Lot 1 and its proximity to Lot 8 of Parcel N constitute unique physical circumstances which have created an unnecessary hardship with respect to the development of Lot 1. Because Madia did not create this hardship, we conclude that the ZHB did not err in granting a building separation variance for Lot 1.

With respect to the dimensional variances for Lots 6, 7 and 8,[18] it is clear that, topographically, these lots are at the narrow end of Parcel O. (R.R. at 476a, 512a.) Because "the lot line just keeps sloping down," the townhouses "keep getting tighter and tighter."[19] (R.R. at 477a.) Indeed, Mr. Madia testified that although he could technically build smaller townhouses on Lots 6, 7 and 8, the units would not be liveable.[20] (R.R. at 476a, 490a–91a, 494a.) Because of this, we believe that there exists a unique physical condition, not created by Madia, which precludes development of the property in strict conformity with the ordinance. Thus, the Ruprechts argument must fail.

## VI.

The Ruprecht's next argue that the ZHB erred in granting a building separation variance for Lot 1 and dimensional variances for Lots 6, 7 and 8 based on a "de minimis" theory. However, we do not believe that the ZHB granted these variances based on a "de minimis" theory.

■ In granting the building separation variance for Lot 1, the ZHB did so based only on the traditional factors for the grant of a variance, as set forth in section 15.512 of Ordinance 398:

We grant that variance and do so on the basis of two reasons. One, the variance granted is less than 25% of the required open space; and two, we specifically find that the minimum building separation has not been observed in [the Hemlocks II] plan and so granting the variance here will not alter the fundamental character of the neighborhood. We believe that ... [sections 15.512(d) and (e)] are the only applicable and relevant requirements for granting a variance here and we find that Madia has satisfied those requirements.

(ZHB's op. at 17–18.) Thus, we will not address the Ruprecht's "de minimis" argument with respect to Lot 1.

Turning to the dimensional variances granted for Lots 6, 7 and 8, the ZHB stated:

[T]hese variances are extremely small, do not alter fundamentally the character of the neighborhood, and are the minimum consistent with the requirements of Section 15.512 paragraph (e). Granting these small variances does not do violence to [Ordinance 398] or the zoning within the Hemlocks II plan, and not granting them would destroy the basic integrity of the eight units as a group.

(ZHB's op. at 18.) Although the ZHB acknowledged that the requested dimensional variances were extremely small, the ZHB did not justify its grant of the variances based on a "de minimis" analysis. Thus, we decline to

**18.** Lot 6 failed to meet the 30–foot rear yard setback by 1.44 feet; Lot 7 failed to meet the requirement by 1.67 feet; and Lot 8 failed by 4.49 feet. Both Lot 7 and Lot 8 failed to meet the 25–foot front yard setback by 2.4 feet.

**19.** Mr. Madia testified that, in constructing these townhouses, he was "trying to go with the []ay of the land." (R.R. at 476a.)

**20.** The ZHB found that, unlike townhouses on the low side of the development which have their garages in the basement, this land is flat and must have garages on the first floor. As a result, living space was limited. (ZHB's op. at 16; R.R. at 475a.)

further address the Ruprecht's "de minimis" argument.

## VII.

Finally, the Ruprechts argue that the ZHB erred in granting a minimum parking variance which allows Madia to construct garages and driveways in the front yards of the townhouses. We do not believe that it was even necessary for the ZHB to grant such a variance.

■ Section 13.150 of Ordinance 398 states in pertinent part: "On a ... townhouse lot, a garage and the access drive to it[ ] may count as required parking areas." (R.R. at 124a.) Section 13.213 of Ordinance 398 provides: "Townhouse—two (2) spaces per dwelling; no spaces in required front yard[.]" (R.R. at 128a.) The Ruprechts maintain that these two provisions, read together, prohibit a garage and access drive in the front yard of a townhouse. We disagree.

We acknowledge that, pursuant to section 1932 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1932, parts of ordinances relating to the same things or class of things are to be construed together. *Earhart v. Board of Supervisors of West Cocalico Township*, 6 Pa.Cmwlth. 455, 296 A.2d 284 (1972). We also recognize that words and phrases shall be construed according to their common and approved usage. Section 1903 of the Statutory Construction Act, 1 Pa.C.S. § 1903.

Construing these two provisions together and giving the words and phrases their common and approved meanings, it is clear that, with respect to townhouse parking: (1) there must be two "spaces" per dwelling; (2) the "spaces" may not be in the front yard; and (3) a "garage and access drive" may count as the required parking area. It is equally clear that, while Ordinance 398 forbids a parking "space" in the front yard of a townhouse, it does *not* restrict the location of a "garage and access drive." Such an interpretation gives effect to both provisions of the ordinance and does not presume that the

two sections are necessarily in conflict with one another. *See* section 1922(2) of the Statutory Construction Act, 1 Pa.C.S. § 1922(2). We believe that this is the proper approach here.[21]

Accordingly, we affirm.

## *ORDER*

AND NOW, this 24th day of July, 1996, the order of the Court of Common Pleas of Allegheny County, dated October 26, 1995, is affirmed.

COLINS, President Judge, dissents.

---

21. Indeed, the ZHB observed in its decision that a significant number of townhouses in the Township have front garages with driveways, and the residents use those driveways for parking. (ZHB's op. at 16.)